

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SC:TDK
F.#2009R00052

*271 Cadman Plaza East*

*Brooklyn, New York  11201*

June 12, 2009

**VIA MAIL AND ECF**

Honorable Sandra L. Townes
United Stated District Court
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Rasheed Freeman
            Criminal Docket No. 09-040 (SLT)

Dear Judge Townes:

      The defendant, Rasheed Freeman, is charged with armed bank robbery in violation of Title 18, U.S.C. §§ 2113(a) and (d) and unlawful use of a firearm in violation of Title 18, U.S.C. 924(c)(1)(A).  By motion dated June 1, 2009, the defendant moved to suppress physical evidence recovered by members of the New York City Police Department ("NYPD") after they stopped the defendant on the evening of January 9, 2009.  (Motion to Suppress Physical Evidence ("Evid. Mot.") at 1.  The defendant also moved to suppress the identification testimony of a witness who identified the defendant after he was arrested.  (Motion to Suppress Identification Motion ("I.d. Mot.") at 1.

      For the reasons set forth below, the defendant's motion should be denied in its entirety.

I.    STATEMENT OF FACTS

      On January 9, 2009, at approximately 5:48 p.m., the defendant, carrying a firearm, entered the TD Bank at 188-10 Hillside Avenue in Queens, New York.  The defendant walked directly up to the two bank tellers, pointed the gun at each of them and provided them with a black plastic bag that he loudly

1

demanded they fill with cash.  The tellers placed over $5,000 in cash and two red dye packs into the bag before the defendant left the bank.

At the time of the robbery, Stephen Gaines, the manager of the bank, was standing in the customer service area, a short distance from the counter where the tellers were stationed.  Gaines immediately noticed the defendant as he entered the bank and continued to watch him throughout the course of the robbery.  Gaines observed that the defendant was an African-American male, well over six feet tall with a muscular build and in his late 20s or early 30s.  Gaines also noticed that the defendant was wearing a powder blue jacket as well as a black scarf that covered his face, which did not permit Gaines to see the defendant's facial features.  At approximately 5:49 p.m., immediately after the defendant left the bank, Gaines activated the silent alarm notifying the NYPD of the robbery.

Members of the NYPD arrived at the bank a short time later and received a description of the suspect from bank employees and other witnesses.  The police were told that the suspect was an African-American male, about 6'2" tall, in his late 20s or early 30s, wearing a blue jacket and a black scarf that covered his face.  The police were also told that, after the suspect left the bank, he fled southbound on foot down 188th Street.  This exact description was broadcast by the police dispatcher over the radio and all available units were directed to canvass the area in search of this suspect.

At approximately 6:02 p.m., Police Officers Ryan McCartan and Paul Martin were in an unmarked patrol car canvassing a residential area approximately three quarters of a mile south of the bank.  At that time, they observed the defendant, the only person on the street, at the corner of Sagamore and Carpenter Avenues.  As the officers drove closer to the defendant, they noticed that the defendant appeared to match the height, race and age of the description broadcast over the radio and that he was also carrying a plastic bag that he was clutching close to his side.  As the officers came along side of the defendant, they observed that he was out of breath and that despite it being a cold, windy evening, he was sweating profusely.[1]

---

[1]  Following his arrest, the police confirmed that the defendant is an African-American male, 6'4" tall and 30 years old.

Officer McCartan, the passenger in the patrol car, rolled down his window, identified himself as a police officer and asked the defendant if he could speak with him. Without responding, the defendant sprinted away from the patrol car. Officer McCartan immediately exited the car and chased the defendant, while Officer Martin drove ahead and maneuvered the patrol car into the defendant's path. The defendant, unable to change course, ran into the patrol car. As the defendant made contact with the patrol car, cash flew out of the black plastic bag the defendant was carrying and a large sum of red, dye-stained currency was taken by the wind and blown all over the street. After the defendant recovered his balance, he continued fleeing before being tackled a few seconds later by Officer Martin. The two officers then attempted to subdue the defendant who resisted violently. Finally, after a brief struggle, the defendant stated "you got me" and ceased fighting with the officers. After handcuffing the defendant, the officers noticed that the defendant's hands were covered with the same red dye they had observed on the money.

When the defendant was arrested he was wearing a dark-colored jacket that also was stained with red dye. Other NYPD officers conducted a search of the area between the bank and the location where the defendant was arrested. Just south of the bank, along 188th Street, the police recovered more dye-stained money as well as a bright blue jacket, grey sweatpants and a black ski hat. The pants and the jacket were stained with red dye.

A short time after the defendant was arrested, Gaines was brought by other officers to view the defendant at the scene of the arrest. When Gaines arrived at the scene, the defendant was handcuffed and in the presence of numerous police officers. Gaines noted that the defendant matched the height, build, age, sex and race of the person he saw rob the bank. Gaines also noted that the recovered cash and the defendant's hands were covered with the same red dye used by his bank's dye packs. Because Gaines never saw the face of the person who robbed the bank, he was unable to make a complete, positive identification, but did confirm that the defendant resembled the man he saw rob the bank in every other respect.

II.  ARGUMENT

The defendant argues that suppression of the tangible property recovered from him -- the dye-stained cash and the plastic bag -- is warranted because the police lacked reasonable suspicion to seize him at the time the evidence was recovered.

3

(Evid. Mot. at 3). For the reasons set forth below, this argument is without merit.

    A.    <u>Legal Standard</u>

A party seeking to suppress evidence obtained in violation of the Fourth Amendment bears the burden of establishing that a government official acted without a warrant and subjected him to a search or seizure. <u>United States v. Arboleda</u>, 633 F.2d 985, 989 (2d Cir. 1980). Once the movant meets this burden, it becomes the government's obligation to prove by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. <u>Id</u>.

    B.    <u>The Terry Stop Was Lawful</u>

Police may detain a suspect for further investigation upon reasonable suspicion of criminal activity. <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968). Under <u>Terry</u>, this temporary detention is justified where an officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal conduct." <u>United States v. Padilla</u>, 548 F.3d 179, 186 (2d Cir. 2008). Reasonable suspicion is a considerably less burdensome standard than probable cause. <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). In examining the reasonableness of a <u>Terry</u> stop, courts look for a "particularized and objective basis" for suspicion of legal wrongdoing under the "totality of the circumstances." <u>Arvizu</u>, 534 U.S. at 273. A <u>Terry</u> stop is permitted where it is justified by "specific, articulable facts." <u>Terry</u>, 392 U.S. at 21.

Here, Officers McCarten and Martin had more than reasonable suspicion to believe that the defendant was involved in the bank robbery. First, the defendant closely matched the description of the bank robber broadcast over the radio. In addition, the defendant was found approximately three quarters of a mile south of the bank nearly fifteen minutes after the robbery had concluded. In light of the fact that the officers were told the suspect had fled the bank on foot heading south, the officers observed the defendant at a place and time where it was reasonable to think the suspect would be found after fleeing the bank 15 minutes earlier. A defendant's presence in the vicinity of a recently committed crime can contribute to the reasonable suspicion needed for a <u>Terry</u> stop. <u>United States v. Davenport</u>, 303 Fed. Appx. 42, 43-44 (2d Cir. 2008). Moreover, the officers' suspicions were further confirmed when they observed that the defendant, the only person on the street in a residential neighborhood, was sweating profusely on a cold

4

January night, out of breath and clutching a plastic bag.[2]

Finally, when approached, the defendant immediately broke into a sprint, disregarding Officer McCartan's request to speak with him. "Headlong flight... is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Courts have held that a defendant's flight may contribute to the reasonable suspicion justifying a Terry stop. Although a Terry stop must be "justified at its inception," Terry, 392 U.S. at 20, a stop has not occurred until a person either voluntarily stops or is physically restrained. California v. Hodari D., 499 U.S. 621, 626 (1991) (Terry stop did not occur until pursuing officer actually tackled defendant). "The grounds for a stop may thus be based on events that occur after the order to stop is given." United States v. Swindle, 407 F.3d 562, 568 (2d Cir. 2005); see also United States v. Simmons, 560 F.3d 98, 107 (2d Cir. 2009) (defendant's flight held to be a crucial factor in reinforcing officers' suspicion that suspect was engaged in criminal activity). Evidence jettisoned by the defendant while fleeing can also contribute to an officer's suspicion. Hodari D., 499 U.S. at 624.

Furthermore, the officers saw a large sum of red dye-stained money fly out of the defendant's bag before the officers were able to subdue him. At the point when Officer Martin tackled the defendant, there was an abundance of evidence justifying the officers' belief that the defendant was connected to the bank robbery and therefore justifying the Terry stop. Once the officers subdued the defendant and observed the dye on the defendant's hands, the officers had probable cause to believe the defendant was the individual who robbed the bank. United States v. Jackson, 240 Fed. Appx. 88, 89 (6th Cir. 2007) (police had probable cause to arrest defendant for a bank robbery committed earlier that day when he was found with dye-stained money).[3]

---

[2] Even though the suspect was described as wearing a blue jacket, something the defendant was not wearing when the two officers encountered him, the officers were reasonable in thinking that the perpetrator of the robbery might jettison his outer layers in an attempt to elude detection by the authorities.

[3] Even absent any connection to the bank robbery, the police had probable cause to arrest the defendant for criminal possession of stolen property in violation of N.Y. Penal Law § 165.45(1).

5

Viewing these facts in their totality, the officers clearly acted reasonably and were wholly justified in their actions. As a result, the defendant's motion to suppress the physical evidence should be denied.[4]

C. <u>The Identification of the Defendant was Permissible</u>

The defendant next argues that suppression of identification testimony by Gaines is warranted because the identification procedure utilized by the police was overly suggestive and ultimately unreliable. (I.d. Mot. at 3). For the reasons set forth below, this argument is without merit.

Under Fed. R. Evid. 801(d)(1)(C), a prior identification is generally admissible. See, <u>United States v. Owens</u>, 484 U.S. 554, 562-63 (1988). Courts will exclude a pre-trial identification only if the procedure that produced the identification is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967).

Here, the witness identified the defendant within approximately 20 minutes of having seen him rob the bank, in what is commonly known as a "showup." A showup entails presenting a single suspect (as opposed to a full lineup) to a witness, often at or near the scene of the crime. <u>Brisco v. Ercole</u>, 2009 WL 1312413, at *88 (2d Cir. May 13, 2009). Although a showup procedure inherently entails some degree of suggestiveness, it is entirely proper for law enforcement to use the procedure in certain circumstances. <u>United States v. Valez</u>, 796 F.2d 24, 27 (2d Cir. 1986) (an officer must make "immediate reasonable efforts to confirm the suspect's identity"). Furthermore, a prompt showup, if it is exculpatory, may "enable the police to resume the search for the fleeing culprit while the trail is still fresh. <u>Brisco</u> at *89.

At the time Gaines viewed the defendant, the defendant was already detained, in handcuffs and surrounded by police officers. However, these procedures are not unusual and have been upheld by courts repeatedly. See e.g., <u>United States v. Bautista</u>, 23 F.3d 726, 730 (2d Cir. 1991) (showup not found to be

---

[4] Although defendant has not moved to suppress the statement "you got me," it is admissible because it was made spontaneously and not under interrogation. See <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995) (statements given without <u>Miranda</u> warnings are admissible absent either custody or interrogation).

6

unnecessarily suggestive where the defendant was shown to the witness in handcuffs, at night, in the custody of police officers and with his face lit by flashlights); United States v. Ortiz, 2000 WL 37998, at *1 (S.D.N.Y. Jan. 18, 2000) (defendants were in handcuffs, standing next to a marked police car, and accompanied by uniformed police officers).  Courts have determined that handcuffs and police custody are "necessary incidents of an on-the-scene identification" and do not "render the pre-trial identification procedure unnecessarily suggestive." Bautista, 23 F.3d at 730.

In this case, it was necessary to conduct a showup immediately after the robbery and at the scene of the defendant's arrest, which confirmed that the police had apprehended the correct suspect.  Alternatively, the showup might have confirmed right away that the defendant was not the perpetrator of the bank robbery.

Even where an identification procedure is found to be unnecessarily suggestive, it may still be permissible where it has "reliability independent of the unduly suggestive identification procedures." Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001).  This secondary inquiry turns on five factors: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  No single factor is determinative; an identification will be permissible "if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." Simmons, 923 F.2d 950.

Viewing the five factors, the evidence demonstrates that Gaines' identification of the defendant is independently reliable.  Gaines had ample opportunity to observe the suspect as he robbed the bank, and his attention during this period was undivided.  The description furnished by Gaines and other witnesses was remarkably accurate.  The defendant is in fact an African-American male, over six feet tall and in his early thirties.  Notably, less than a half an hour had elapsed between the crime and the showup.  Therefore, the showup possessed sufficient indicia of reliability.

Accordingly, because the identification procedure employed here was proper and does not render the witness's

7

testimony otherwise unreliable, the defendant's motion to suppress the identification testimony should be denied.

III. Conclusion

    For the reasons set forth above, the defendant's motion should be denied in its entirety.

                              Respectfully submitted,
                              BENTON J. CAMPBELL
                              United States Attorney

                    By:      /s
                          Todd D. Kaminsky
                          Assistant United States Attorney

    CC: Kafahni Nkrumah, Esq.