**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------x
UNITED STATES OF AMERICA

-against-                                                                    **MEMORANDUM & ORDER**

RASHEED FREEMAN,                                                 09-CR-040 (SLT)

Defendant.
-----------------------------------------------------x

**TOWNES, United States District Judge:**

  Rasheed Freeman ("Defendant") is accused of committing the crimes of bank robbery in violation of 18 U.S.C. §§ 2113(a) and 2113(d) and unlawful use of a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(ii). On June 1, 2009, through his counsel, Defendant filed motions to suppress (1) a black bag and money stained by red dye seized from him by police on January 9, 2009, and (2) evidence of his identification by a witness through a "show up" on the same date. On July 1, 2009, the Court conducted an evidentiary hearing and both of Defendant's suppression motions were denied. Since the Court did not have time to place its finding of facts and conclusions of law on the record, it promised to issue a written decision. This Memorandum & Order sets forth the Court's findings and conclusions.

### FINDINGS OF FACT

  At the suppression hearing, the Government presented three witnesses – New York City police officers Ryan McCartan and Richard Lazar and TD Bank branch manager Steven Gaines. This Court fully credits the testimony of Officer McCartan and Gaines. From the creditable evidence, the Court makes the factually findings that follow.

  On January 9, 2009, at approximately 5:48 p.m., an individual entered the TD Bank located at 188-10 Hillside Avenue in Queens, New York. The individual walked directly to two bank tellers, with a gun drawn, and demanded that the tellers give him money. Tr. 107:10-12,

1

109:15-19. After pointing the gun at each of the tellers, he produced a bag and ordered the tellers to put money in the bag. *Id*. at 112:2-3, 14-21. The tellers placed over $5,000 in the bag along with two red-dye packs. *Id*. at 122: 9-10. The individual then ran out of the bank and was observed heading in a southbound direction on 188th Street. *Id*. at 113:11-15.

At the time of the robbery, the bank's manager, Gaines, was standing in the bank's lobby, about ten feet away from the tellers station. *Id*. at 110:13, 107:10. From his unobstructed vantage, Gaines witnessed the individual enter the bank with a gun drawn and begin to yell at the tellers. *Id*. at 108:10-12, 115:23. Gaines concluded that the individual was a male based on his stature and voice. *Id*. at 108:20-21. He observed the individual wore a bright blue jacket, tan pants, a hood over his head, and a scarf tied around his face. *Id*. at 108:12-13; 111:15-16, 134:13-17. Because of the scarf, Gaines could not see the individual's face. *Id*. at 111:15-16. Gaines noticed that the individual was taller than himself and approximated his height at 6'2". *Id*. at 109:7-8. Gaines also stated that the individual was a "big guy" and "pretty broad." *Id*. at 109:10. He also saw that the individual was black from his exposed hands. *Id*. at 111:20-22. After the robber received the money from the tellers, Gaines watched him run out of the bank and turn southbound on 188th Street. *Id*. at 113:11-14. From the robber's speed, Gaines estimated that he was in his late 20s. *Id*. at 114:11-15. At some point during the robbery, Gaines was able to trigger the bank's silent alarm. *Id*. at 110:17. According to Gaines, the entire robbery lasted about 40 seconds. *Id*. at 117:24. Gaines's attention was directly focused on the robber for the entire time except for the two to three seconds he looked down to hit the alarm. *Id*. at 118:3-6. The police arrived at the bank about five minutes after the robbery. *Id*. at 117:17-18. Gaines informed the police of the individual's clothing, race, build, height and physical characteristics. *Id*. at 118:14-15, 20-22, 24-25, 119:4-7.

At approximately 5:50 p.m. Officer McCartan and his partner were on patrol in an unmarked police vehicle wearing civilian attire, as part of their duties as members of the 103rd Precinct Anti-Crime Unit, a group assigned to investigate felonies involving violent crimes and weapons possession. *Id*. at 10:9-22; 30:2-6. Officer McCartan was seated in the passenger seat, while his partner drove the unmarked vehicle. *Id*. at 18:22-24. At that time, the radio dispatcher for the New York City Police Department relayed via the officers' portable radio that a gun point robbery had occurred at the TB Bank within the 103rd Precinct. *Id*. at 11:5-7, 21-25; 12:6-8. 16-18. As Officer McCartan's partner drove toward the location of the robbery to canvass the area and look for potential suspects, further information was information was provided. *Id*. at 18:22-24; 15:1-2. The robber was described as a black male, tall, approximately six foot two inches, in his late twenties to early thirties, wearing a blue jacket and black scarf. *Id*. at 13:1-6. He was last seen fleeing southbound on 188th Street. *Id*. at 13:5-6; 16:20-22; 15:14-19.

The officers went to 188th Street and drove southbound to Jamaica Avenue to Woodhull Avenue travelling eastbound toward Sagamore Avenue. *Id*. at 15:25; 16:1-3. The officers followed this route because they reasoned that this was the area where the perpetrator might be headed. *Id*. at 42:6-7. The Long Island Railroad station was in the area, and they believed that the train could be used to escape the area. *Id*. at 16:9-11. In addition, there is a high concentration of multi-tenant apartment buildings in the Woodhull Avenue and Sagamore Avenue area, which house a large number of parole violators and criminal recidivists. *Id*. at 16:7-14.

The officers initially observed the Defendant on the corner of Sagamore Avenue and Carpenter Street as he headed eastbound on Carpenter Street at approximately 6 p.m. *Id*. at 34:1-19, 24; 35:7-8. He was the only pedestrian in the area at the time and the officer's car

3

approached Defendant from behind. *Id*. at 18:11-14, 17-18; 22:16-18; 35:21-22. Defendant generally matched the description of the perpetrator broadcast over the officers' radio. Officer McCartan could see that Defendant was a tall black male, standing six feet two inches or taller with a large build; however, he was not wearing a black scarf and blue jacket as the broadcast described. *Id*. at 22:25-23-1; 25:18-22. Defendant was walking at a very hurried pace down the street with a dutiful purpose. *Id*. at 18:5-7. He was furtively clutching something with his hands at his right waistline area. *Id*. at 18:5-7; 23:2-5, 7, 11-12; 26:2; 42:9-11. The officers watched Defendant for approximately ten seconds, before pulling alongside him with a distance of about ten feet between them. *Id*. at 21:8-12, 45:20-25; 46:1-10. At that point, Officer McCartan rolled down his car window and shone his flashlight at Defendant's face. *Id*. at 19:2-5; 36:3-4; 42:11-12. Defendant was sweating profusely, even though the weather was slightly breezy and cold with a temperature of approximately twenty-five degrees. *Id*. at 18:17-18; 19:4-5, 14; 28:25-29:1; 36:5; 42:12-15; 46:13-14. Defendant was also breathing heavily. *Id*. at 19:19. Officer McCartan described Defendant as looking like a "deer in the headlights." *Id*. at 19:14-16; 36:5-6. After about four seconds, Officer McCartan then identified himself and stated, "Police, come here, I need to talk to you." *Id*. at 19:5-7; 46:24-25; 47:1-4. At that point, Defendant began running at full speed up the block. *Id*. at 19:7-8, 23-23; 47:5-6, 48:15-17; 49:2-4.

      Officer McCartan jumped out of the car and pursued Defendant on foot. *Id*. at 19:23-24; 48:18-19; 49:5-9. Meanwhile, his partner drove the car ahead of Defendant and stopped and Defendant ran full speed into the rear passenger area of the vehicle. *Id*. at 19:25-20:1-3; 48:20-24. The force of the impact with the car caused a black bag Defendant was carrying to fly into the air and red-dye stained money to fall onto the street. *Id*. at 20:2-4, 20-25; 24:2-3. After a struggle, Officer McCartan and his partner were able to subdue Defendant. *Id*. at 20:5-9, 13-19.

4

At that point, Defendant stated, "You got me." *Id*. at 20:18-19. Defendant's hands were visibly stained with red dye. *Id*. at 21:3-4. The apprehension occurred on Carpenter Street between Sagamore Avenue and 197th Street, ten to twelve blocks from the TD Bank. *Id*. at 27:19-25, 28:1; 45:1-19; 48:20-22; 84:17-21.

Approximately ten minutes after police officers first arrived at the bank, Gaines was informed that other officers had stopped a possible suspect and they wanted him to identify that person. *Id*. at 119:10-12. He was driven in a police car with sirens and lights flashing to the site of the individual's arrest, a short three minute drive away. *Id*. at 119:16-17; 129:24-130:1; 119:10-12, 19-22. When Gaines arrived, he witnessed Defendant with other police officers and at least one other police car present. *Id*. at 131:11-12. Defendant was handcuffed with his hands behind his back and lying with his stomach on the ground. *Id*. at 132:2-3.

Gaines told officers that he could not positively identify Defendant as the bank robber because he did not see the perpetrator's face, but that Defendant was a similar build, height, race, and gender to the perpetrator. *Id*. at 120:20-22; 121:1-4. Gaines also noticed that Defendant had red dye on his hands and that a black bag containing money was covered with red dye across the street. *Id*. at 122:5-6. Gaines concluded that the red dye was from the dye packs the tellers slipped into the perpetrator's bag. *Id*. at 122:9-12. Defendant was not wearing the clothes that Gaines observed in the bank; he was wearing a black leather jacket at the time of the arrest. *Id*. at 133:15. Gaines also did not see the hood or black scarf on Defendant. *Id*. at 133:19-25. At the time of his arrest, Defendant was wearing blue jeans, not the tan pants Gaines saw in the bank. *Id*. at 134:7.

## DISCUSSION

**I.        Suppression of Physical Evidence**

5

Defendant moves to suppress the physical evidence – i.e., the black bag and dye-stained money – seized on January 9, 2009 as the product of an illegal search and seizure. He argues that police lacked reasonable suspicion to seize him at the time the evidence was recovered.

**a. Legal Standard for *Terry* Stops**

It is well established that "the police can stop and briefly detain a person for investigative purposes." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Known as a "*Terry*" stop in judicial parlance, a police officer may briefly detain and question an individual when the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30; *see also United States v. Simmons*, 560 F.3d 98, 103 (2d Cir. 2009); *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). "[T]he amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *United States v. Padilla*, 548 F.3d 179, 186-87 (2d Cir. 2008). In determining whether the officers had "reasonable suspicion" to justify a *Terry* stop, the Court considers whether the officers, under the "'totality of the circumstances,'" had a "'particularized and objective basis'" for suspecting the individual to be engaged in criminal wrongdoing. *Simmons*, 560 F.3d at 103 (quoting *United States v. Arivizu*, 534 U.S. 266, 273 (2002)); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (articulating the test of reasonable suspicion to be when the officers "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion"). The test is an objective one measured from the perspective of a trained law enforcement officer. *United States v. Cortez*, 449 U.S. 441, 418 (1981).

To determine whether there was reasonable suspicion for a *Terry* stop, the Court must first determine the precise moment that the *Terry* stop was executed by the officers, namely, when Defendant was "seized," because only "the facts available to the officer at the moment of the seizure" may be evaluated in determining whether reasonable suspicion warranted the detention. *Terry*, 392 U.S. at 21-22. The Court must then determine whether, based on the facts known to the officers at the time of seizure, there was some objective justification for stopping the individual that is more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (citing *Sokolow*, 490 U.S. at 7; *Terry*, 392 U.S. at 27) (internal quotation marks omitted).

### b. The Seizure

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) (a seizure has occurred when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"); *Simmons*, 560 F.3d at 105-6. In this Circuit, a seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person who does not submit to an officer's show of authority is physically restrained. *Simmons*, 560 F.3d 105.

In this case, Officer McCartan ordered Defendant to stop after observing him walking at a hurried pace, clutching something at his waist, and perspiring profusely in very cold weather. He fit the general physical description of the robber, such as the height, weight, build, and race of the broadcast report, with the exception of the described attired. He was ten to twelve blocks from the bank and observed in the area where the officers estimated that the robber travelling on

7

foot would be. In response to McCartan's order to stop, Defendant fled from the officers. He sprinted full-speed up the block and McCartan gave chase on foot. Defendant stopped after running into the back of the officers' car driven by McCartan's partner. After a struggle ensued, McCartan and his partner were able to subdue Defendant and Defendant stated, "You got me."

Since Defendant did not comply with McCartan's order to stop, Defendant was not "seized" until he was physically restrained by the two officers. *See United States. v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005); *see also Simmons*, 560 F.3d at 107 ([S]eizure . . . occurs when the fleeing suspect is physically apprehended."). Thus, the reasonable suspicion inquiry begins at the point just prior to Defendant's detention by McCartan and his partner after he had run into the police vehicle. *See United States v. Bellamy*, 592 F. Supp. 2d 308, 316 (E.D.N.Y. 2009) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their seizure") (internal quotation marks omitted).

  c. **Reasonable Suspicion**

Based on the finding of facts articulated above, the Court finds that the officers had enough suspicion to effect a *Terry* stop at the time of Defendant's seizure. When Defendant was subdued, Officer McCartan and his partner gathered the following information: (1) that the perpetrator was heading in the direction that Defendant was found; (2) that Defendant was in close proximity to the bank, only ten to twelve blocks away; (3) that the Woodhull-Sagamore Avenues area had a large number of parole violators and criminal recidivists and encompassed a train station which could be used to flee the area; (4) that the Defendant fit the general physical description of the suspect – *i.e*., a black male, tall, approximately six foot two inches; (5) that Defendant was walking at a hurried paced; (6) that Defendant was making a furtive movements, clutching his right waist line area; (7) that Defendant was sweating profusely, even though it was

8

cold outside; (8) that he was breathing heavily, (9) that Defendant appeared like a "deer in headlights" when he was approached by the officers; (10) the fact that he fled from the officers when Officer McCartan identified himself; and (11) the observation of red-dyed money coming out of the bag Defendant was carrying.

Taken together, these facts reasonably raised the specter of wrongdoing on Defendant's part, especially only fifteen minutes after the report of an armed robbery in the vicinity. The officers found Defendant in the area that the perpetrator was expected to be based on an eyewitness report. They had ample opportunity to observe him, watching him from behind for several seconds before approaching him. The officers had a matching description, suspicious movements (furtively clutching and hurried walking), the appearance that Defendant just undertook great physical exertion (the sweating and heavy breathing), and the Defendant's action of fleeing from the officers. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight . . . is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *see also See Simmons*, 560 F.3d at 107 ("Flight in response to an order to stop is relevant to the reasonableness of a stop because it precedes the seizure. . . .").

In *United States v. Simmons*, the Second Circuit found reasonable suspicion where the officer seized a defendant based on the defendant's resemblance to the description of the suspect, his presence in a high-crime area, the defendant's movements with his hands in his pockets, suggesting that he was concealing a weapon, and, significantly, the defendant's noncompliance with the officer's order to stop. 560 F.3d at 108-09. Defendant's actions in this case also strongly reinforce the officer's suspicion that he may have engaged in criminal activity.

The fact that Defendant was not wearing the same clothes as the description of the clothes worn by the perpetrator does not alter the reasonable suspicion inquiry. As Officer

9

McCartan testified, "many times when people commit robberies they often wear two layers of clothing and they remove the first layer so that when they try to escape their appearance looks somewhat different." Tr. 26:7-10.

Accordingly, based on the totality of the circumstances, the Courts holds that the officers had reasonable suspicion at the time Defendant was restrained. Defendant's motion to suppress the physical evidence seized on his person on January 9, 2009 is denied.

## II. Suppression of Gaines Identification Testimony

Defendant also moves to suppress Gaines's identification testimony. He argues that Gaines observed Defendant as he was handcuffed and surrounded by a massive police presence. Thus, he contends that his identification was a product of unnecessarily suggestive "show up."

### a. Due Process Inquiry Into the Admissible of Identification Testimony

"Reliability is the touchstone for the admission of eyewitness identification testimony pursuant to the Due Process Clause of the Fourteenth Amendment." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). When a defendant objects to identification testimony to be given by a witness who has identified him prior to trial, a sequential inquiry is required in order to determine whether either the prior identification or an in-court identification of the defendant comports with due process. The Second Circuit describes this two-stage, due process inquiry as follows:

> The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator. If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; no further inquiry by the court is required, and the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. If the court finds, however, that the procedures were [unnecessarily] suggestive, it must then determine whether the identification was nonetheless independently reliable. In sum, the identification evidence will be admissible if (a) the procedures were not [unnecessarily] suggestive or (b) the identification has independent reliability.

10

*Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001); *see also id*. at 134 (discussing whether evidence was "unduly" or "unnecessarily" suggestive).

Under the first step of this analysis, an identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Brisco*, 565 F.3d at 88 (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The "showup" procedure used here is "inherently suggestive" because it involves the presentation of a single suspect to a witness by the police and has been "widely condemned." *Id*. (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Nevertheless, a showup identification violates due process only if it is an "unnecessarily suggestive" procedure. *Id*.

Even if an identification procedure is unduly suggestive, the identification may nonetheless be admissible if it is determined that it is independently reliable under the second step of the analysis. To ascertain whether an identification "has reliability independent of the unduly suggestive identification procedures," *Raheem*, 257 F.3d at 135, courts generally look to five established factors, first set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972): (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is assessed "in light of the totality of the circumstances." *Raheem*, 257 F.3d at 135.

    **b. Resemblance Testimony**

As a threshold matter, the Court reviews whether the due process inquiry applies to this case. The Government concedes that Gaines cannot identify Defendant as the individual who robbed the TD Bank on January 9, 2009. Because the perpetrator's face was covered by a scarf, at most, Gaines can only testify that Defendant's characteristics resemble the characteristics of the individual who robbed the bank. Thus, this testimony is more actually characterized as "resemblance testimony" rather than "identification testimony." The courts of appeals which have addressed this question have been split as to whether resemblance testimony raises the same due process concerns as identification testimony and, thus, whether courts must apply the due process inquiry as articulated above. The Second Circuit has not yet had occasion to rule on this question.

The District of Columbia Circuit has ruled that resemblance testimony must still satisfy the dictates of due process. *United States v. Brooks*, 449 F.2d 1077, 1083 (D.C. Cir. 1971). The court explained,

> While "resemblance" testimony projects some uncertainty on the part of the witness, it is part of the evidence which the jury may consider to constitute a basis for a guilty verdict, and a defendant's rights would be violated if such testimony had been obtained by the Government e.g., by an arrantly suggestive confrontation."

*Id*. In that court's view, unnecessarily suggestive conduct by the Government "is not to be exonerated because the linkage testimony actually secured from the confrontation witnesses was weak rather than emphatic." *Id*. Thus, the court held that it could not "accept . . . that [the due process inquiry is] wholly inapplicable to 'resemblance' witnesses." *Id*.

The Fourth Circuit disagreed with this approach. *See Patler v. Slayton*, 503 F.2d 472, 476-77 (4th Cir. 1974). The Fourth Circuit recognized that the line between resemblance and

12

identification testimony is "admittedly thin." *Id*. at 476. Nevertheless, the court held that it is a "line worth drawing." *Id*. The court reasoned,

> Aside from police deterrence, the spirit of [the due process inquiry] is to prevent the conviction of those who may be innocent when a susceptible witness is unfairly allowed to conclude: 'he is the guilty one.' It is far less dangerous to admit testimony, as was done here, that the malefactor was 'dark haired' and 'had a brown coat on' and 'looked something like [the defendant],' which was the gist of [the witness's] testimony.

*Id*. at 476-77. While resemblance testimony does not "insulate [the Government's] improper identification procedures from scrutiny," the court preferred to rely on the expertise of the "skilled trial judge to separate the tainted matter from what the witness actually observed at the scene of the crime and thus avoid an unnecessarily blunt application of the exclusion rule of [the due process inquiry]." *Id*. at 476. Thus, despite a suggestive police confrontation between the witness and the defendant, the court approved of the trial judge's limitation of the witness's testimony to the fact that the defendant's appearance was not "in conflict" with the person she observed at the crime scene. *Id*. at 477.

To this Court's knowledge, the Seventh Circuit is the only other circuit to confront this question. *See United States v. Bush*, 749 F.2d 1227, 232 (7th Cir. 1985). In that case, two judges of the panel held that resemblance testimony "may raise due process concerns," citing the D.C. Circuit's *Brooks* opinion. *Id*. Nevertheless, in applying the due process inquiry, the court concluded that an in-court confrontation was not so suggestive to taint her resemblance testimony. *Id*. (applying *United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984)). Another judge on the panel wrote a separate concurrence to distance himself from the application of *Archibald* because there was no in-court identification. *Id*. at 1235 (Coffey, J., concurring). The concurrence suggests that the due process inquiry is not necessary because resemblance

13

testimony does not constitute a positive identification and the defense counsel had ample opportunity to cross-examine the witness's inability to identify the defendant. *Id*.

The Court finds the D.C. Circuit's reasoning more persuasive. A witness's testimony that is less than "positive identification" should not be immunized from due process concerns. It is true that the uncertainty attendant with resemblance testimony may play a greater role in the minds of jurors, diminishing its impact. Nevertheless, constitutional protections should apply to this testimony regardless of its probativity. "Reliability" remains the "lynchpin" of admissibility of identification testimony. *United States v. Zadiriyev*, No. 08-CR-1327, 2009 WL 1787922, at *1 (S.D.N.Y. June 23, 2009). The Court can foresee that the suggestiveness of a prior identification could so taint even resemblance testimony that due process requires an independent adjudication of its reliability. Accordingly, the Court now applies the due process inquiry to Defendant's motion.

### c. Suggestiveness

As stated above, showup procedures are "inherently suggestive" but not inherently inadmissible unless they are also "unnecessarily suggestive." *Brisco*, 565 F.3d at 88. Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect. *Id*. Accordingly, the Second Circuit has instructed that where an officer has "or should have doubts whether a detained suspect is in fact the person sought, the officer must make 'immediate reasonable efforts to confirm the suspect's identity.'" *Id*. (citing *United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994)). The Second Circuit has also approved of the

admission of identification evidence from showups held in close temporal and geographic proximity to the crime scene. *Brisco*, 565 F.3d at 88.

Here, Gaines observed Defendant handcuffed behind his back and lying with his stomach on the ground. Other police officers were present on the scene as well as at least one police car. These circumstances fall right in line with showups held in admissible in other courts. *See, e.g., Bautista*, 23 F.3d at 729-32 (showup not unnecessarily suggestive where defendant was presented to the witness "in handcuffs; at night; in the custody of police officers; with his face lit by flashlights; and in the presence of [an officer] who, each time the [witness] identified a suspect, radioed to his fellow officers, 'it's a hit'"); *United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir.) (identification proper where suspects were brought to victim who was sitting in a police car); *United States v. Sanchez*, 422 F.2d 1198, 1199-200 (2d Cir. 1970) (police drove suspects by witnesses at the scene of the crime); *United States v. Ortiz*, No. 99-CR-532, 2000 WL 37998, at *1 (S.D.N.Y. Jan. 18, 2000) (defendants were in handcuffs, standing next to a marked police car, and accompanied by uniformed police officers). The fact that this showup took place approximately twenty minutes after the robbery and only ten to twelve blocks away from the bank also supports the conclusion that it was not unnecessarily suggestive. *See, e.g., Warren v. Conway,* No. 07-CV-4117, 2008 WL 4960454, at *23 (E.D.N.Y. Nov.18, 2008) ("Showup identification procedures that occurred within temporal and geographic proximity to the crime have generally not been found to be unduly suggestive.") (showup took place one mile from and 90 minutes after the crime); *Charlemagne v. Goord*, No. 05-CV-9890, 2008 WL 2971768, at *15 (S.D.N.Y. June 30, 2008) (showup procedure within thirty minutes and eighteen blocks from the crime) (citing cases); *Corchado v. Rabideau*, 576 F. Supp. 2d 433, 450 (W.D.N.Y. 2008) ("The fact that the show-up occurred within thirty minutes of the shooting and in reasonably close

15

proximity to the scene of the crime favors a finding that the procedure was not unduly suggestive and was, instead, the product of effective police work."); *McCray v. Barkley*, No. 03-CV-4821, 2004 WL 32931, at * 9-10 (S.D.N.Y. Jan. 7, 2004) (two showup identifications within thirty minutes of victim notifying police that he had spotted a group that had robbed him); *McBride v. Senkowski*, No. 98-CV-8663, 2002 WL 523275, at *5-6 (S.D.N.Y. Apr. 8, 2002) (showup identification over two hours after robbery where suspects were surrounded by officers). Indeed, the exigencies of either having an armed robber free in the community or holding a potentially innocent man in incarceration justified rushing Gaines to identify Defendant.

      This case is strikingly similar to a recent habeas case upholding a robbery conviction. *Kirk v. Burge*, No. 07-CV-7467, 2009 WL 438054 (S.D.N.Y. Aug. 6, 2009). In that case, police officers apprehended an individual seen running from a store that just had been robbed. *Id*. at *1. A police officer brought one of the storeowners to the site of the individual's arrest. *Id*. The witness observed the defendant while he was handcuffed, in front of a white van, and had uniformed officers around him. *Id*. at *9. The habeas court upheld the admissibility of the showup because it occurred in the vicinity of the alleged robbery within minutes of the alleged robbery. *Id*.

      The fact that Defendant was the only civilian surrounded by police activity, handcuffed and in police custody at the time of the confrontation is unavailing. These circumstances are regular features in showups and found in several cases holding no suggestiveness. *Bautista*, 23 F.3d at 729-32 (suspects were handcuffed and in the presence of officers); *Ortiz*, 2000 WL 37998, at *1 (suspect was handcuffed next to a marked police vehicle). The Court does note that, in the haste to confirm their suspect's identity, the police neglected to sit Defendant up before permitting Gaines to identify him. Tr. 131:17-24. A better course would have been to

16

allow the Defendant to be seated before the identification. Nevertheless, such a procedure in this case is not sufficient to cast the showup into constitutional doubt.

### d. Reliability

Even if the showup was found to be suggestive, Gaines's resemblance testimony would still possess a "sufficient indicia of reliability" to permit admissibility under the *Biggers* facts as set forth above. *Bautista*, 23 F.3d at 730.

First, Gaines had a clear unobstructed view of the bank robber. He stood in the bank lobby approximately ten feet away from the tellers station, in close enough proximity to observe and hear the robber's demands for money from the tellers. *See Butler,* 970 F.2d at 1021 (ten feet away sufficiently close distance to view defendant). Second, while the entire robbery lasted only about 40 seconds, Gaines focused his attention directly on the robber for the totality of the robbery save for the two to three seconds while he pushed the silent alarm. Courts routinely have held that a viewing of a similarly short duration is sufficient to support a subsequent identification. *See, e.g., Brathwaite,* 432 U.S. at 108, 129 (encounter lasted a "couple of minutes"; viewing time was probably as little as 15-20 seconds); *Simmons,* 390 U.S. at 385 (witnesses viewed perpetrators for "periods ranging up to five minutes"); *Kwong,* 69 F.3d at 666 (witness focused directly on individual and provided detailed description); *United States v. Wong,* 40 F.3d 1347, 1360 (2d Cir. 1994) ("two to three seconds" sufficient); *United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir. 1992) (witness viewed perpetrators for less than three minutes).

Third, Gaines's descriptions of the perpetrator to the police accurately reflect Defendant's characteristics. Gaines described the perpetrator as a black male in his late 20s, with a height of approximately 6'2" and a large build. Gaines description of the robber's height, build, race, sex,

17

age and gender all resemble Defendant's characteristics. Furthermore, Gaines identified the direction in which the perpetrator ran and Defendant was arrested in that general direction. These accuracies strongly militate in the testimony's reliability.

Fourth, Gaines's level of certainty in this case poses an interesting question. Gaines did not positively identify Defendant as the individual at the bank because the perpetrator covered his face with a scarf. The Government argues that Gaines will only testify to the Defendant's resemblance to the bank robber. In this, Gaines was emphatic that Defendant's characteristics were consistent with perpetrator's characteristics. Tr. 120:20-22 ("The person that was at that scene was a similar build, was a similar height from what I could tell and also was a black male."). Thus, the Court credits this factor as supporting reliability.

Finally, the time between the robbery attempt and Gaines's confrontation with Defendant was less than 20 minutes. Such a temporal proximity again favors reliability under the circumstances.

In sum, all six *Biggers* factors counsel in favor of admissibility of Gaines's resemblance testimony. Thus, with his resemblance testimony deemed reliable, the Court denies Defendant's motion to suppress Gaines's testimony regarding Defendant's resemblance to the bank robber.

## CONCLUSION

For the foregoing reasons, Defendant's motions to suppress 1) the black bag and money stained by red dye seized from him by police on January 9, 2009, and (2) evidence of his identification by a witness through a "show up" are denied.

**SO ORDERED.**

_____/s/_____
**SANDRA L. TOWNES**
**United States District Judge**

Dated: Brooklyn, New York
      September 25, 2009